# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROLANDO SOLIS,<br><br>               Petitioner,<br><br>   v.<br><br>J. YATES,<br><br>               Respondent. | 1:07-CV-00221 JMD HC<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT**<br><br>**ORDER DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY** |

Petitioner Rolando Solis ("Petitioner") is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## **PROCEDURAL HISTORY**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation. Petitioner is incarcerated at Pleasant Valley State Prison in Coalinga, pursuant to a judgement of the Fresno County Superior Court. (Pet. at 1). Petitioner was convicted by a jury in October 2003 of second degree murder (Cal. Penal Code § 187(a)). (Answer at 2). Petitioner was sentenced to a term of fifteen years-to-life. (Pet at 1; Answer at 2).

Petitioner appealed his conviction to the California Court of Appeal on June 3, 2004. (Lod. Doc. 2). The state appellate court affirmed Petitioner's conviction in a reasoned opinion on May 24, 2005. (Lod. Doc. 12; Am. Pet. Ex. 1). Petitioner subsequently filed a petition for rehearing, which was denied. (Answer at 2).

Petitioner filed a petition for review to the California Supreme Court. (Lod. Doc. 5). The

California Supreme Court summarily denied the petition on August 10, 2005. (Pet. Ex. A).

Petitioner filed a petition for habeas corpus in the Fresno County Superior Court on December 23, 2005. (Lod. Doc. 14). The Superior Court denied the petition on January 8, 2006. (*See* Lod. Doc. 16, Ex. 2).

On February 3, 2006, a petition for writ of habeas corpus was filed by Petitioner in the California Court of Appeal. (Lod. Doc. 15). The appellate court denied the petition on February 17, 2006.

Petitioner subsequently filed for habeas corpus relief in the California Supreme Court on March 17, 2006. (Lod. Doc. 16). The California Supreme Court denied his petition on November 15, 2006. (Id).

On February 9, 2007, Petitioner filed the instant federal petition for writ of habeas corpus with the Court. (Pet. at 1). The petition originally sets forth ten grounds for habeas corpus relief.

On August 21, 2007, Respondent filed an answer to the petition.

On September 19, 2007, Petitioner amended his petition to add an additional ground for relief. Respondent filed a supplemental reply pertaining to the additional ground on October 19, 2007. Petitioner filed a reply to Respondent's supplemental answer on December 5, 2007.

Consent to Magistrate Judge Jurisdiction

On February 22, 2007, Petitioner consented, pursuant to Title 18 U.S.C. § 636(c)(1), to have a magistrate judge conduct all further proceedings, including entry of the final judgment. (Court Doc. 7).

On July 18, 2007, Respondent also consented to the jurisdiction of a magistrate judge. (Court Doc. 19).

On February 6, 2009, the case was reassigned to the undersigned.

**FACTUAL BACKGROUND**[1]

On the afternoon of April 17, 2001, Mario Uribe and Anthony Flores were working on a car in the back yard of Uribe's home, when appellant entered the yard.

---

[1]The facts are derived from the factual summary set forth by the California Court of Appeal, Fifth District, in its unpublished opinion issued on May 24, 2005, and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).

Uribe denied knowing him; Flores had seen him before, but they had never met.[2] Appellant, who was looking at the car, asked if anyone wanted any body work, because he did it. His hands were empty, and no gun was visible.

Donio Sanchez, who was a good friend of Uribe and Flores and the godfather of Uribe's daughter, entered the yard a short time later. He greeted Uribe and Flores, but refused to shake appellant's hand. Instead, he said, ' "[F]uck this fool,' " and that he knew him "from the county." His manner turned "a little bit aggressive" while he was saying that he knew appellant from the county jail. Sanchez said something like, " '[F]uck this. Let's do this right now." Uribe's attempts to calm him down were unsuccessful.

According to Uribe, Sanchez removed his hat and threw it onto the ground, then started walking toward appellant. His hands were empty, although his fists may have been clenched. Appellant, who was standing on the back steps of the house, said, " 'I'm going to shoot you,' " or " 'I'm going to show you.' " Sanchez was coming toward him to fight; appellant did not want to fight, and twice backed up the steps. Sanchez took steps toward appellant, but not enough to draw within fighting distance.

According to Flores, by contrast, Sanchez recognized appellant, who then said to him, " 'I will shoot you.' " Sanchez threw down his hat and told appellant to come on.[3] Appellant remained on the top step during the entire incident. Flores never saw Sanchez move in any direction or take any steps after appellant said he would shoot.

Uribe and Flores both heard a sound like clicking or the slider being pulled back on a semiautomatic weapon, and then a gunshot. Sanchez fell to the ground, possibly after taking a few steps. Appellant looked surprised and said, " '[O]h, shit,' " and, according to Uribe, ' "I'm getting the fuck out of here.' " He then fled through the house. The entire incident took no more than five minutes.

Officer Aranas of the Fresno Police Department was first on the scene. At the time of his arrival, within five to ten minutes of the shooting, Sanchez was awake, but bleeding from the area of his right temple. When Aranas asked if Sanchez knew who did it, Sanchez appeared to start to respond, then stopped himself. Aranas interviewed Flores a short time later. In part, Flores said appellant was standing on the top step of the porch during the incident, approximately four feet from where Aranas had seen Sanchez lying on the ground upon his arrival. Flores said nothing about Sanchez making any movement toward appellant, or about appellant saying that he would shoot Sanchez. Flores related that after the gunshot, the shooter said, " 'Oh, shit.' " Flores's manner indicated this was said in shock or surprise.

Officer Sanders interviewed Uribe at the scene. In part, Uribe said that once Sanchez arrived in the back yard, he immediately tried to fight with the shooter. Although Uribe tried to get Sanchez to calm down and told him that the man was all right, Sanchez started toward the shooter, who was backing up onto the steps. The shooter then pulled out a small, chrome-plated semi-automatic, and shot Sanchez in the head. According to Uribe, the shooter yelled, " 'Oh, shit,' " and acted surprised that he had shot or had hit Sanchez. Uribe said he had never seen the shooter before. He knew Sanchez, however, and said that Sanchez liked to fight.

Sanchez was taken to the University Medical Center (UMC) emergency room. He had an awareness level of 11 on the Glasgow Coma Scale (GCS), which ranges from 3 (comatose) to 15 (fully alert). He was able to follow commands. According to

[2]According to appellant's sister, Uribe and appellant knew each other and had been together at her house. She and Uribe's mother lived on the same street. Dawn Dervishian, Flores's former girlfriend, testified to seeing Flores, Uribe, and appellant together sometime around November of 2000. This occurred on Lewis Street, on which Flores's aunt resided. Dervishian saw Flores and appellant together on at least two other occasions as well.

[3]On cross-examination, Flores testified that Sanchez threw down his hat, then appellant said, " 'I will shoot you.'

Dr. Hysell, a neurosurgeon who subsequently assessed Sanchez, he would have been very confused and stuporous, insofar as his orientation was concerned. He possibly would have been able to recall long-term memory (i.e., several weeks past), and possibly would have been able to identify someone he knew from weeks or months earlier. Although the GCS does not measure memory function, it was Hysell's opinion that with a rating less than 15, it was unlikely that everything he said was accurate.

Fresno Police Officer Nelson was dispatched to the hospital to attempt to obtain Sanchez's statement. Upon his arrival, he could see that Sanchez had suffered a gunshot wound to the head, but there were too many people around him to allow Nelson to speak to him. At 2:42 p.m., Sanchez was taken from the trauma room to X-ray for a CT scan, and Nelson was able to talk to him.[4] Sanchez was in a lot of pain and moaning, but he made eye contact with Nelson. Nelson asked Sanchez two or three times who shot him before Sanchez finally replied, " 'Rooster. I am with him. He did it. Lewis Street.' " Nelson was with Sanchez approximately 30 to 45 seconds. He did not notice any facial damage or drooping, and did not recall Sanchez's speech being slurred.

Hysell saw Sanchez in the emergency room at approximately 3:00 p.m., after the first CT scan. Sanchez's GCS was still 11, and he was "very stuporous." Moreover, he had a facial drop on the right side, indicating an injury to the seventh cranial nerve. Injury to that nerve limits one's ability to move eyebrows and mouth, resulting in slurred speech. Hysell noted that Sanchez's mental status was limited and his speech was slurred. A bullet had entered just in front of his right ear and traveled from front to back, very slightly right to left, and very slightly downward. It damaged the temporal lobe (which is responsible for short-term memory) and traversed the cerebellum, and a portion of the bullet came through the back of the skull. Because of concerns raised by the initial CT scan, Sanchez underwent a cerebral angiogram. His neurological state then deteriorated to a GCS of three. A repeat head CT revealed a blood clot; as a result, Hysell performed emergency surgery to remove the clot and dead brain tissue. He also removed some pieces of lead and bone fragments. Because the bullet was fragmented, however, some residual fragments remained lodged in Sanchez's brain.

After surgery, Sanchez's condition was very poor. His GCS rating stayed at three. He remained at UMC for a month and a half, during which time he continued to have a very poor neurological exam, as well as "a very long and complicated hospital course" which included a cardiac arrest. Ultimately, he was discharged for transfer to a convalescent home.

Sanchez was admitted to the subacute facility in Exeter on June 1. He remained in a coma until sometime in July, when he unexpectedly began to improve. By August 14, he could sit in a wheelchair and respond to verbal commands with a nod of his head. He could also answer yes and no to questions, point with his finger if he wanted to address something, and follow commands. Dr. Rehman, his primary physician at the subacute facility, believed he could process a question in his mind and articulate an answer, and he was "very much appropriate" in his responses. According to Diana Hernandez, Sanchez's sister, the longer he was out of the coma, the more his memory improved.

On August 13, 2001, Fresno Police Detective Chamalbide showed Sanchez seven photographic lineups, each containing six photographs. Chamalbide included photographs of people who used the name "Rooster," and people with whom Sanchez had had problems in jail. Because Sanchez had blurred vision in one eye, Chamalbide had him look at each photograph, then nod "yes" or "no" when Chamalbide asked whether the person was the one who shot him. Chamalbide was satisfied that Sanchez

---

[4]Doctors had advised Nelson that Sanchez was in critical condition, but coherent.

understood what he was being asked to do. Sanchez did not identify anyone.[5] After each lineup, Sanchez appeared frustrated and almost angry, as if he wanted to tell Chamalbide something, but they were unable to communicate using words.[6]

On August 28 or 29, Diana Hernandez asked Sanchez whether Rooster had shot him. Sanchez shook his head no and spelled "Joker" on his letter board. When she asked whether Uribe knew who had shot him, Sanchez nodded yes. As a result, Hernandez went to Uribe's house on August 29. When she demanded that he tell her what he knew, Uribe showed her a Crime Stoppers page dated January 17, 2001, pointed to appellant's picture, and identified him as the person who shot Sanchez. Uribe said his nickname was Joker. Hernandez gave the information to Chamalbide, although she never told Sanchez whom Uribe had identified. Uribe subsequently gave the Crime Stoppers page to Sanchez's mother.

Sanchez continued to do well during August, although he was unable to breathe without a tracheostomy (a tube in the neck area). People with tracheostomies are very prone to infections because of the foreign object, and Sanchez had episodes of infections. He also had episodes of urinary tract infections because of his Foley catheter, a tube for urine. He was treated for those infections with antibiotics and made a good recovery. However, on September 4, he had seizure activity which may have been the result of damage to his brain. He was transferred to Kaweah Delta Hospital for several days for evaluation and treatment. Dr. Hipskind, who evaluated Sanchez in the emergency room, concluded that he had probably sustained a mucous plug in his tracheostomy tube, as a result of which he began to retain carbon dioxide and had a lower oxygen level than normal. Suctioning his breathing tube appeared to relieve the blockage. Sanchez was released from Kaweah Delta on September 10. Because a mucous plug is a constant danger for someone in Sanchez's condition, it was possible it could have formed again after his release, since he was never able to tolerate having the tracheostomy removed. Once back at the Exeter facility, Sanchez again started to improve. He was able to go home for a couple of hours on two or three occasions in September.

On September 10, Detective Chamalbide received information from Sanchez's sister that Mario Uribe had identified appellant as the shooter. As a result, Chamalbide showed a photographic lineup, containing appellant's picture, to Anthony Flores the next day. Flores identified appellant, and expressed fear for his or his family's safety. He said he had been hiding out because he had heard that the person who did the shooting had called Uribe and threatened Uribe's family.

On September 19, Chamalbide showed the photographic lineup to Uribe, who began to shake and cry. He said the person was there, but he did not want to identify him because he was afraid for his family. He said he had been threatened, but that he did not know the name of the person who called him. He said he would call Chamalbide back with the number of the person who committed the shooting, but he never did. As he told Chamalbide that he was afraid for his family, he was looking directly at appellant's photograph.

Later that day, Chamalbide met with Sanchez. Chamalbide determined that Sanchez could understand him, then he showed Sanchez a photographic lineup containing a picture of appellant. Sanchez identified appellant as the person who shot

---

[5]Uribe was shown the same lineups and said that none of the people was the shooter. Flores similarly failed to identify anyone in the lineup he was shown on the day of the shooting. Chamalbide could not locate him later to show him the other lineups.

[6]Although Sanchez eventually used a letter board to communicate, Chamalbide did not recall him having the board that day.

him. When Chamalbide asked whether the person who shot him used the name Rooster, Sanchez moved his head to indicate no. When Chamalbide asked if the person's name was Joker, Sanchez moved his head to indicate yes. Chamalbide and Sanchez could not communicate well enough for Chamalbide to learn why Sanchez had named Rooster right after he was shot.[7]

        Sanchez was readmitted to Kaweah Delta Hospital for two days on September 21, due to imbalances in his carbon dioxide and oxygen levels, but he was sufficiently stabilized by September 25 to be approved for an outing with his mother. He continued to progress well through October 15, at which point his condition suddenly deteriorated. Although he had had respiratory distress during flare-ups of his pneumonia, he suffered a respiratory arrest on October 18. Dr. Rehman termed the event "very unusual." Sanchez died on October 29, 2001. In Dr. Rehman's opinion, pneumonia was probably the primary cause of death. What led to the pneumonia was the tracheostomy, which Sanchez needed as a result of the gunshot wound. All of the medical procedures which Sanchez underwent were "part and parcel" of his originally having been shot.

        Dr. Gopal performed the autopsy on Sanchez. In pertinent part, he found damage to various parts of the brain, as well as areas in which brain matter was missing. In addition, he removed a medium-caliber, copper-jacketed lead bullet from the right side back of the neck, and bullet fragments from the brain. In Gopal's opinion, the cause of death was complications of perforation of the brain due to a gunshot wound to the head.

(Lod. Doc. 12 at 2-9).

## DISCUSSION

### I.    Jurisdiction and Venue

    A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution and Petitioner's custody arose from a conviction in the Fresno County Superior Court. Fresno County is within this judicial district. 28 U.S.C. § 84(b). As an application for writ of habeas corpus may be filed in either the district court where Petitioner is currently incarcerated or

---

[7]Dr. Bhatia, a neurologist who reviewed Sanchez's medical records but never actually saw Sanchez himself, testified that a nurse's note dated September 14 related that Sanchez had long- and short-term memory impairment. The records further showed a rising level of carbon dioxide in Sanchez's blood between September 18 and 21, on which date he was transferred to Kaweah Delta Hospital with confusion and an altered mental status. Bhatia opined that the deterioration in Sanchez's condition between September 18 and 21 would have affected his memory and ability to understand what was going on around him. In Bhatia's opinion, the information Sanchez gave right after he was shot was probably more reliable than anything he recalled after he came out of the coma. Between September 17 and 20, Sanchez would have been very confused because of his medical status and the medication he was being given. In Bhatia's opinion, Sanchez's identification of appellant from the photographic lineup was suspect. There was no way to know Sanchez's level of cognition because his cognition was never tested.

in the district where Petitioner was sentenced, the Court has jurisdiction over and is the proper venue

for this action. *See* 28 U.S.C. § 2241(d).

## II.    ADEPA Standard of Review

In April 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320, 326-327 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499

(9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting <u>Drinkard v. Johnson</u>, 97

F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by*

<u>Lindh</u>, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)).  The

instant petition was filed in February 2007 and is consequently governed by the provisions of

AEDPA, which became effective upon its enactment on April 24, 1996.  <u>Lockyer v. Andrade</u>, 538

U.S. 63, 70 (2003).

As Petitioner is in the custody of the California Department of Corrections and Rehabilitation

pursuant to a state court judgment, Title 28 U.S.C. section 2254 remains the exclusive vehicle for

Petitioner's habeas petition.  <u>Sass v. California Board of Prison Terms</u>, 461 F.3d 1123, 1126-1127

(9th Cir. 2006) (quoting <u>White v. Lambert</u>, 370 F.3d 1002, 1006 (9th Cir. 2004) in holding that §

2254 is the exclusive vehicle for a habeas petitioner in custody pursuant to a state court judgment

even where the petitioner is not challenging his underlying state court conviction).  Under AEDPA, a

petition for habeas corpus "may be granted only if he demonstrates that the state court decision

denying relief was 'contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States.'" <u>Irons v. Carey</u>, 505 F.3d

846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)); *see* <u>Lockyer</u>, 538 U.S. at 70-71.

As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71

(quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this

Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of

the time of the relevant state-court decision." <u>Id</u>. (quoting <u>Williams</u>, 592 U.S. at 412). "In other

words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72, (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413; *see also* <u>Lockyer</u>, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." <u>Id</u>. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *See* <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir. 2003); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

### III.    Review of Petitioner's Claim

Petitioner asserts eleven grounds for relief: (1) ineffective assistance of counsel based upon trial counsel's errors; (2) ineffective assistance of counsel based upon defense investigator's delay;

(3) ineffective assistance of counsel based upon defense investigator's testimony at trial and inadequate report; (4) prosecutorial misconduct in withholding exculpatory evidence; (5) prosecutorial misconduct in commenting on Petitioner's failure to testify; (6) prosecutorial misconduct in misstating the law pertaining to mitigation; (7) trial court's denial of motion for mistrial deprived him of constitutional rights; (8) trial court's failure to assist jury deprived him of state created liberty interest; (9) jury misconduct in discussing Petitioner's failure to testify violated his Fifth Amendment right against self-incrimination and Sixth Amendment right to a fair trial; (10) cumulative error; and (11) trial court's denial of his motion for a new trial constitutes an abuse of discretion.

### A.      Ground One, Two, and Three: Ineffective Assistance of Counsel Claims

In Grounds One through Three, Petitioner raises several allegations of ineffective assistance of counsel stemming from the actions of his trial counsel.  Petitioner raised these claims to the California Court of Appeal, which was the last court to issue a reasoned opinion in this case.  (*See* Lod. Doc. 12).  The California Supreme Court summarily denied Petitioner's claims.  When reviewing a state court's summary denial, the Court "look[s] through" the summary disposition to the last reasoned decision.  *See* Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991)).  Thus, the California Supreme Court is presumed to have adjudicated Petitioner's claims for the same reasons cited by the California Court of Appeal in their reasoned denial of Petitioner's claim.  *See* Ylst v. Nunnemaker, 501 U.S. at 803.

Generally, ineffective assistance of  counsel claims are analyzed under the "unreasonable application" prong of 28 U.S.C. § 2254(d).  Weighall v. Middle, 215 F.3d 1058, 1061-1062 (9th Cir. 2000).  For the purposes of habeas cases governed by 28 U.S.C. § 2254(d), the law governing ineffective assistance of counsel claims is clearly established.  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998).  An allegation of ineffective assistance of counsel requires that a petitioner establish two elements–(1) counsel' s performance was deficient and (2) petitioner was prejudiced by the deficiency.  Strickland v. Washington, 466 U.S. 668, 687(1984); United States v. Olson, 925 F.2d 1170, 1173 (9th Cir. 1991); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).   Under the first element, Petitioner must establish that counsel's representation fell below an objective standard of

reasonableness, specifically identifying alleged acts or omissions which did not fall within reasonable professional judgment considering the circumstances. Strickland, 466 U.S. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential and there exists a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

Secondly, Petitioner must show that counsel's errors were so egregious that Petitioner was deprived of the right to a fair trial, namely a trial whose result is reliable. Strickland, 466 U.S. at 687. To prevail on the second element, Petitioner bears the burden of establishing that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Quintero-Barraza, 78 F.3d at 1348 (quoting Strickland, 466 U.S. at 694). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the Petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697. Since prejudice is a prerequisite to a successful claim of ineffective assistance of counsel, any deficiency that was not sufficiently prejudicial to Petitioner's case is fatal to an ineffective assistance of counsel claim. Id.

Here, Petitioner contends that counsel was deficient on numerous grounds, including: (1) counsel failed to object to the filing of an amended information on the first day of trial; (2) counsel's cross examination of one of the eye witnesses to the crime (Uribe) resulted in the admission of rebuttal evidence regarding Petitioner's propensity for violence; (3) counsel agreed to the prosecutor's request for issuance of inapplicable jury instructions (4) counsel's misunderstanding of the law relating to mitigation impacted his ability to convey the defense's theory of mitigation during closing arguments; (5) counsel's failure to oversee defense investigators led to the investigator's delay in interviewing possible alibi witness and investigator's faulty preparation and presentation of interview reports.

### 1. *Failure to Object to Amended Information*

Petitioner alleges that counsel's failure to object to the amended information was so deficient

and prejudicial as to deprive him of his Sixth Amendment right to counsel. On the first day of trial, the prosecutor amended the information against Petitioner to include additional charges of attempted murder and assault with a firearm. As noted by the appellate court, a timely objection by counsel would have compelled the trial court to disallow the amended information. (Lod. Doc. 12 at 21). The appellate court concluded though that it was not unreasonable for counsel to permit the amended information. The court reasoned that:

> In light of the potential causation and intent issues which existed in this case, we cannot say it would be unreasonable for a defense attorney to "hedge his or her bets" by seeking to present the jury with an alternative somewhere between a conviction for some species of unlawful killing and acquittal, to which appellant might not otherwise have been entitled. This is especially true where, as here, the worst-case scenario (conviction of both offenses) would not have added any immediate time to the sentence due to section 654. Since the record before us neither contains an explanation for defense counsel's failure to object to the amendment nor precludes a satisfactory explanation, "we will not, on appeal, find that trial counsel acted deficiently." ( People v. Stewart (2004) 33 Cal.4th 425, 459.)

(Id. at 22).

The appellate court's opinion finding that counsel's performance was not deficient was an objectively unreasonable application of *Strickland*. In light of the causation issues present in this case, counsel's failure to object to the amended information was objectively unreasonable. Under the original information, a jury that found Petitioner did not cause the victim's death but did possess a specific intent to kill would have been forced to acquit Petitioner. Under the amended information, the same jury would have been able to convict Petitioner of attempted murder. Had the jury found Petitioner caused the death of the victim but lacked the specific intent required for first degree murder (and for attempted murder) the inclusion of attempted murder would not have any significance. Thus, it is unclear to this Court how such conduct, namely exposing one's client to an additional charge without any possible benefit, constitutes reasonable professional judgment.

Although the Court questions the reasonableness of the appellate court's conclusion pertaining to counsel's performance, the appellate court's conclusion that prejudice did not result from such deficiency was not objectively unreasonable. As noted above, prejudice is a prerequisite for a finding that the defendant was denied effective assistance of counsel. *See* Strickland, 466 U.S. at 687. Here, Petitioner's attempted murder conviction was reversed by the appellate court.

Pursuant to California Penal Code section 654(a), Petitioner's sentence was not lengthened by his assault with a firearm conviction as he was  was subsumed in his conviction for first degree murder. Consequently, the state appellate court found that Petitioner had suffered no prejudice stemming from counsel's failure to object.  As Petitioner's sentence was not altered by his conviction for assault with a firearm, the state court's conclusion that there was no prejudice does not amount to an objectively unreasonable application of clearly established Federal law.  *See* Glover v. United States, 531 U.S. 198, 202-205 (2001) (concluding that a criminal defendant suffers prejudice when counsel's ineffective performance leads to an increased sentence for the defendant).

### 2. *Cross Examination of Uribe*

During examination of Uribe, Petitioner's counsel inquired about the victim's reputation for violence.  Pursuant to California law, evidence of the defendant's character for violence is admissible after evidence that the victim possessed a character for violence has been introduced by the defendant to show conformity with that character.  Cal. Evid. Code §§ 1103(a)(1) and (b).  As a result of counsel's questioning, the prosecutor was thus able to admit evidence of Petitioner's altercation with another party the day prior to the shooting.  During this altercation, Petitioner was portrayed as the initial aggressor and allegedly threatened a teenager with a gun.  (Lod. Doc. 12 at 23-24).

As acknowledged by the appellate court, defense counsel professed unawareness of the law pertaining to the introduction of the defendant's character for violence.  (Id. at 25-26).  The Court of Appeal found that while counsel's decision was not a tactical decision, entitled to the court's deference or presumption of reasonableness, the decision was nonetheless objectively reasonable under the circumstances.  (Id. at 26-27).

The portrayal of the victim as the initial aggressor or at the very least as having a character for violence would have aided the defense's theory of mitigation due to heat of passion or sudden quarrel.  Here, the existing evidence revealed a question of fact regarding who was the initial aggressor with Uribe testifying that the victim advanced towards Petitioner, who had retreated and had stated he did not want to fight.  Meanwhile, Flores (the other eye witness) testified to the contrary–denying that Petitioner retreated or that the victim advanced towards Petitioner.  Thus, the

victims' character for violence might have made the jury more inclined to believe that the victim was the initial aggressor. Thus, the Court does not find objectively unreasonable counsel's examination of the witness on the victim's character for violence as the probative value of such evidence outweighed the introduction of evidence that Petitioner possessed the same character for violence. This is especially true considering that the jury would have already heard evidence indirectly demonstrating Petitioner's propensity for violence. As noted by the appellate court, the jury would have already been exposed to the fact that Petitioner habitually carried a firearm, was under investigation by a homicide detective for an unrelated crime, had been arrested on numerous occasions, and had an outstanding warrant for his arrest.

For these reasons, the appellate court concluded that Petitioner had failed to show prejudice. The appellate court's finding of no prejudice was also predicated on the trial court's issuance of instructions limiting the jury's consideration of the character evidence to intent, identity, and knowledge or possession of means necessary for the crime charged. (Lod. Doc. 12 at 28; CT at 239-241). "We must presume that the jury followed those instructions." United States v. Awad 551 F.3d 930, 940 (9th Cir. 2009); *see* Greer v. Miller, 483 U.S. 756, 766 n. 8 (1987) (plurality opinion) ; *see also* Richardson v. Marsh, 481 U.S. 200, 206 (1987) (stating that, "[t]he rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process"). Considering the trial court's limiting instructions and the fact that the jury was already exposed to indirect evidence of Petitioner's character for violence, the Court does not find the appellate court's conclusion that Petitioner suffered no prejudice an objectively unreasonable application of *Strickland* and other Supreme Court precedents.

### *3.* *Issuance of CALJIC Nos. 5.00 and 5.01*

The trial court issued CALJIC Nos. 5.00 and 5.01 pursuant to the request of both parties. (RT at 1923). Petitioner claimed on appeal, and here before this Court, that counsel's request for the issuance of CALJIC Nos. 5.00 and 5.01 amounts to ineffective assistance of counsel. CALJIC Nos. 5.00 and 5.01 as issued by the trial court, respectively states:

The unintentional killing of a human being is excusable and not unlawful when, one, committed by accident and misfortune in the performance of a lawful act by lawful means; and two, the person causing the death acted with that care and caution which would be exercised by an ordinarily careful and prudent individual under like circumstances.

The unintentional killing of a human being by accident and misfortune is excusable when committed in the heat of passion upon a sudden combat or upon a sudden and sufficient provocation.

Sufficient provocation is that which would provoke a reasonable person to fight, provided:

One, the person killing was not the original aggressor;

Two, no undue or unfair advantage was taken of the other by the person killing;

Three, no dangerous or deadly weapon was used by the person who killed during the fight;

The killing was not done in a cruel or unusual manner;

The act of killing was not the result of gross negligence.

(RT at 1976).

The Court initially notes that trial counsel's decision to issue CALJIC No. 5.01 was apparently tactical in nature, as counsel attempted to explain in a post verdict motion for a new trial, stating that, "it is true I did request 5.01. In light of the circumstances, *the strategy was right*. I was including everything that *could have possibly* applied to my client...I believe it was ineffective assistance of counsel for me to add that instruction, *especially in light of what happened as a result of that*. I just screwed up on that." (RT at 2119-2120) (emphasis added). Counsel, and Petitioner, seem to argue that because counsel's tactical decision failed, it amounts to ineffective assistance of counsel. Because the Ninth Circuit accords counsel wide latitude in formulating trial tactics and strategy, the Court does not find that counsel was deficient for requesting CALJIC No. 5.01 merely because the theory in that instruction was unsuccessful. *See, e.g.*, Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995) (stating "[t]actical decisions that are not objectively unreasonable do not constitute ineffective assistance of counsel").

More importantly, though, the Court finds that the appellate court's holding, that Petitioner suffered no prejudice, was not an objectively unreasonable application of clearly established Federal law. The state appellate court found that it was not erroneous for the trial court to have issued the instructions and any objection on the part of defense counsel would have been unsuccessful. Additionally, the court noted that even if defense counsel's objection would have prevented the issuance of CALJIC Nos. 5.00 and 5.01, no prejudice resulted from the issuance of the jury

1  instruction. While acknowledging the potentially confusing nature of CALJIC No. 5.00, the

2  appellate court noted though that the two jury instructions did not preclude the jury from considering

3  evidence or theories available to the defense under the law. The lack of prejudice resulting from the

4  issuance of these jury instructions is evident in the petition submitted to this Court. Petitioner claims

5  that "defense counsel requested CALJIC Nos. 5.00 and 5.01 even though the evidence provided no

6  basis for a favorable outcome from the rules contained in the instructions [and] competent counsel

7  would have objected to them." (Am. Pet. at 14). Petitioner has not alleged that the issuance of these

8  instructions actually harmed him; merely that they were irrelevant and thus could not produce a

9  favorable outcome for him on excusable homicide based on either lawful act (CALJIC No. 5.00) or

10 heat of passion (CALJIC No. 5.01). As noted by the appellate court, the issuance of these

11 instructions did not preclude consideration of relevant legal theories. The trial court issued jury

12 instruction pertinent to the defense, including instruction on voluntary and involuntary manslaughter,

13 second degree murder resulting from unlawful act, and provocation stemming from sudden

14 quarrel/heat of passion. Additionally, the jury was directed by the trial court that some of the jury

15 instructions were not necessarily applicable to the case. (CT at 329; *see* CALJIC No. 17.31). The

16 Court does not find the state court's examination of the prejudice prong to have been an objectively

17 unreasonable application of Federal law, and thus rejects Petitioner's claim for habeas relief.

18          ***4.       Failure to Explain the Law in Closing Argument***

19          Petitioner contends that counsel was deficient in presenting his closing argument. (Am. Pet.

20 at 14-16). Specifically, Petitioner challenges counsel's presentation of the defense's alternative

21 theory of the heat of passion or sudden quarrel in mitigation of the murder charge.[8]

22          The appellate court found counsel's failure to explain to the jury the distinction between

23 excuse and justification (resulting in an acquittal) and mitigation (resulting in conviction of the lesser

24 included offense of manslaughter) fell below the standard of competence demanded of criminal

25 attorneys. (Lod. Doc. 12 at 48). The appellate court ultimately rejected Petitioner's claim of

26

27          [8]In addition to proceeding on the claim that Petitioner was not the person who committed the shooting, the defense
28 also argued at trial that if Petitioner did in fact shoot the victim it was out of heat of passion or sudden quarrel, thereby
negating the malice aforethought required for murder.

ineffective assistance, though, finding that no prejudice resulted from counsel's deficient performance. (Id. at 49-51). The appellate court specifically distinguished this situation from those "in which defense counsel argued against his client, conceded guilt, bypassed a potentially meritorious defense in favor of arguing a theory not recognized as a lawful defense, or deprived appellant of an adjudication of the strongest of the defenses available to him." (Id. at 49) (citations omitted). The state court went on to note that the defense presented a viable theory, which arguably had more evidentiary support and would have resulted in a total acquittal for defendant if successful. (Id).

The appellate court's conclusion that no prejudice resulted from counsel's error rests primarily on the fact that the law was correctly and adequately explained to the jury by the trial court and that the jury subsequently rejected any mitigation theory. The jury's finding in connection with the trial court's instructions necessarily meant that the jury found unavailing the evidence admitted at trial to support Petitioner's defense of mitigation. Thus, the appellate court found unconvincing the argument that Petitioner would have received a more favorable result had counsel correctly explained the law pertaining to mitigation, a function the trial court adequately served. (Id. at 50-51).

The Court agrees with the state appellate court that counsel's failure to clearly explain the distinction between mitigation of murder and justification was objectively unreasonable, such that it would satisfy the first prong of *Strickland*. Nor does the Court find that the state court's additional conclusion, that Petitioner failed to establish that such deficiency prejudiced him as required to obtain relief under *Strickland*, was an objectively unreasonable application of the law. While the jury's finding are not *per se* indicative of a lack of prejudice as the jury might not have so easily brushed aside the defense's theory of mitigation in the face of a more coherent closing by counsel, the facts here do not lead the Court to find a reasonable probability that the result would have been more favorable to the Petitioner had counsel not been deficient in this respect. As noted by the appellate court, the jury was correctly and adequately instructed on the law of mitigation by the trial court. The jury was further instructed that they were to look to the court's instructions and not counsel's arguments in ascertaining the law. As such, the jury was presumably not mistaken as to

the requirements of the law when it subsequently returned a verdict against Petitioner on the murder charge. While the jurors had questions, as discussed *supra*, those questions centered around the distinction between second and first degree murder. Thus, the Court does not find that Petitioner is entitled to relief on this ground.

### 5. *Defense Investigator's Errors*

Petitioner raises several allegations pertaining to errors committed by the defense investigator–specifically the delay in interviewing an alibi witness which resulted in the exclusion of this witness at trial and inadequate report and testimony by the investigator and his assistant regarding their interview of Uribe. (Am. Pet. 17-20).

Petitioner presented these claims in a habeas petition to the state courts. (*See* Lod. Docs. 14, 15, 16). The Fresno County Superior court summarily denied Petitioner's claims, finding that Petitioner provided no new evidence justifying the requested relief. (Lod. Doc. 16, Ex. 2). The California Court of Appeal and California Supreme Court, respectively, issued summary denials of the petitions. Thus, there exists no reasoned opinion from the state courts pertaining to these alleged errors. Where a state court provides no rationale for its decision, a federal habeas court determines whether the state court's decision was "objectively unreasonable" based on its independent reading of the record. Brazzel v. Washington, 491 F.3d 976, 981 (9th Cir. 2007) (quoting Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002)); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000), *overruled on other grounds by* Lockyer, 538 U.S. at 75-76; *see also* Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

### *a.* Delay in Interviewing Alibi Witness

Petitioner alleges that trial counsel and his defense investigator were ineffective for delaying in interviewing his alibi witness, Ms. Siquieros. Petitioner claims that this delay resulted in the trial court's exclusion of this witness. Petitioner argues that the exclusion of Ms. Siquieros prejudiced the defense's theory that Petitioner was not the perpetrator as no evidence regarding his whereabouts at the time of the crime was introduced. Respondent contends in his answer that Petitioner has failed to meet his burden in establishing prejudice as his allegations about the nature of Ms. Siquieros' testimony is conclusory in nature. Respondent noted that Petitioner had failed to present the contents

of the defense investigator's report or other similar evidence that would establish what Ms. Siquieros would have testified to.

In support of his contentions, Petitioner submitted to this Court the declarations of Ms. Siqueiros, stating she would have testified that Petitioner was with her at all times during a five day period encompassing the crime, that she was willing to testify at trial, that she provided contact information to Petitioner's sister prior to trial, and that she was not contacted until after the trial had already started by the defense investigator. (*See* Court Doc. 34). Petitioner additionally submits the declaration of his sister, Ms. Solis, attesting to her attempt to contact counsel and that she relayed Ms. Siqueiros' contact information to the investigator prior to trial. (*See* Court Doc. 33). Such information would ordinarily lead the Court to find that Petitioner is entitled to an evidentiary hearing as consideration of these declarations would provided a factual basis for a colorable habeas claim. A review of the records, however, reveals that the declaration of Ms. Siqueiros was never produced in the state courts; thus Petitioner has failed to develop the factual basis for this claim before the state courts. Under AEDPA, a federal habeas court may not grant an evidentiary hearing if Pettiioner "has failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2); *see also* Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999) (quoting Cardwell v. Greene, 152 F.3d 331, 337 (4th Cir. 1998), *overruled on other grounds by* Bell v. Jarvis, 236 F.3d 149 (4th Cir. 2000)).

The Supreme Court has interpreted "failed to develop" to mean that there must be a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams v. Taylor, 529 U.S. 420, 432 (2000). A defendant is not at fault if he properly seeks an evidentiary hearing in state court and the request is denied. Estrada v. Scribner, 512 F.3d 1227, 1235-36 n. 7 (9th Cir. 2008); Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir. 2004). The inquiry in determining whether a petitioner has been diligent is "whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." Wiliams, 529 U.S. at 435; *see also* Bragg v. Galaza, 242 F.3d 1082, 1090 (9th Cir. 2001). Here, the information contained in Ms. Siqueiros declaration and her willingness to testify was known to Petitioner before trial as evidenced by his allegation that he told counsel about her existence as an alibi witness and

counsel's attempt to offer her as a witness at trial. As Petitioner knew of this information during the entire time he was pursuing relief in state courts, Petitioner's failure to include the declaration in either the direct review of his conviction or on collateral proceedings amounts to a lack of diligence at the very least. *See* <u>Bragg</u>, 242 F.3d at 1090 (noting that petitioner seeking relief for ineffective assistance of counsel "who did not take advantage of state collateral proceedings to develop the factual record before he filed his federal habeas petition" was not entitled to an evidentiary hearing to expand the factual record before the federal habeas court).

The Court is especially troubled by Petitioner's failure to submit this additional information to the state courts as the Fresno County Superior Court's summary denial of his habeas petition was based on a lack of new evidence justifying the requested relief. (*See* Lod. Doc. 13, Ex. 2). Permitting Petitioner to then bring this evidence in his federal habeas petition would violate the principle of comity central to AEDPA. As stated by the Supreme Court

> "Comity ... dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." O'Sullivan v. Boerckel, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.

<u>Williams</u>, 529 U.S. at 437.

Based on the Court's independent reading of the evidence produced before the state courts, Petitioner fails to establish prejudice resulting from this error. While the Court finds convincing the argument that counsel was deficient in delaying the interview of Ms. Siqueiros until after trial had begun, the state court records reveal nothing that would establish prejudice as there was no evidence pertaining to what Ms. Siqueiros would have testified to. As such, the Court cannot say that the state court's summary denial of this issue was objectively unreasonable.

### *b.* *Errors of Defense Investigator and Assistant*

Petitioner further alleges that he was deprived of his right to effective assistance of counsel by the "ham handed" investigation conducted by the defense investigator. (Am. Pet. at 19-21).

1  Specifically, Petitioner contends that the investigator was deficient in waiting a year to write his

2  investigation report regarding his interview with Uribe. (Id. at 19). Petitioner also contends that the

3  defense investigator's assistant prejudiced his case when it was revealed her original notes from the

4  Uribe interview conflicted with the report she eventually produced, and which was more consistent

5  with the defense investigator's version of the interview. (Id). Petitioner contends that counsel's

6  failure to oversee the investigation and ensure that the investigator was conducting the investigation

7  in a competent manner constitutes ineffective assistance of counsel. (Id. at 20). Petitioner contends

8  prejudice resulted as the investigator's error deprived Petitioner of obtaining vital information.

9  Petitioner also points to the juror's response, stating that the investigator's delay in preparing the

10  report and the assistant's inconsistent report "hurt the defense." (Id).

11     The Court finds that the state court's summary denial was not objectively unreasonable.

12  Petitioner's contention that the investigator's error deprived Petitioner of obtaining vital information

13  is a conclusory allegation as he does not allege what vital information he was deprived of; thus, this

14  alleged error does not warrant habeas corpus relief. *See* <u>Jones v. Gomez</u>. 66 F.3d 199, 204-205 (9th

15  Cir. 1995) (finding that conclusory allegations are not sufficient to support habeas relief). Petitioner

16  has also failed to establish how the result would have been more favorable to him had the defense

17  investigator not delayed in preparing his report of the interview. Petitioner has also failed to

18  establish that he would have received a more favorable report if the assistant's report been more

19  consistent with her notes. The inconsistency in the assistant's report pertained to whether Uribe had

20  been threatened, an allegation that was cumulative of the testimony offered by Detective

21  Chamalbide. Detective Chamalbaide testified that Uribe told him he did not want to identify the

22  perpetrator because he was afraid for his family. (RT at 634). While the juror stated that such

23  testimony hurt the defense, the Court does not find that the errors alleged of prejudiced Petitioner

24  such that the result can be called into question. Respondent correctly points out that the veracity of

25  Uribe testimony was already tested by evidence offered at trial beyond the testimony of the defense

26  investigator and the assistant. Consequently, the Court finds no prejudice resulted from the delay in

27  preparing the report and the inconsistency between the assistant's report and her notes.

28  \\\

## B.    Ground Four: *Brady* Error

Petitioner claims that his Fourteenth Amendment right to due process of the law was violated by the trial court's denial of a new trial.[9] Petitioner's motion for a new trial was predicated on the prosecutor's suppression of a television documentary, including footage of the victim in the hospital emergency room. Petitioner claimed that the suppression violated his constitutional rights as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963). As the California Court of Appeal was the last court to adjudicate the claim on the merits, the California Supreme Court is presumed to have adjudicated the claim for the same reasons as set forth in the Court of Appeal's opinion. *See* Ylst v. Nunnemaker, 501 U.S. at 803-804.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. Supreme Court precedents following *Brady* require a criminal defendant to prove three elements in order to show a *Brady* violation. Benn v. Lambert, 283 F.3d 1040, 1052 (9th Cir. 2002). First, the suppressed evidence must be exculpatory or impeachment material favorable to the defendant. Id. (citing United States v. Bagley, 473 U.S. 667, 676 (1985)). Second, the evidence must have been suppressed by the State, either willfully or inadvertently–thus requiring the defendant to establish that the prosecution knew or should have known during the proceedings of the evidence's existence and that the defendant did not possess the evidence, nor could he have obtained it with reasonable diligence. *See* United States v. Agurs, 427 U.S. 97, 110 (1976); *see also* U.S. v. Zuno-Arce, 25 F.Supp.2d 1087, 1116 (C.D. Cal. 1998); *accord* U.S. v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991); U.S. v. Dupuy, 760 F.2d 1492, 1502 n.5 (9th Cir. 1985). Third, a defendant must establish that prejudice resulted from the failure to disclose the evidence as "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678. Evidence is material "only if there is a reasonable probability

---

[9]The petition also claims a violation of Petitioner's Fifth Amendment right to due process. (Am. Pet. at 22). However, as Petitioner's conviction stems from a state court judgment, only the Due Process Clause of the Fourteenth Amendment is implicated. *See* Betts v. Brady, 316 U.S. 455, 562 (1942), *overruled on other grounds by* Gideon v. Wainwright, 372 U.S. 335 (1963); Castillo v. McFadden, 399 F.3d 993, 1002 n. 5 (9th Cir. 2005).

that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682.

There exists no dispute about whether the prosecutor knew of the videotape's existence nor whether Petitioner possessed the evidence prior to the conclusion of the trial. Rather, Petitioner and Respondent dispute whether the evidence is material and favorable to Petitioner. Petitioner claims that the documentary footage is material and favorable as it would have corroborated the testimony of Officer Frank Nelson that the victim identified someone else as the shooter. Specifically, Petitioner seems to argue that the level of responsiveness the victim displayed in the video would have made Officer Nelson's testimony more reliable and less susceptible to attack by the prosecutor. Respondent contends that the state appellate court did not unreasonably apply Federal law in finding that the evidence was not material. Respondent further posits that the video had no probative value regarding the victim's medical condition.

The state appellate court's review of the video resulted in a conclusion that the evidence was not material nor was it favorable to Petitioner. The appellate court first reviewed the standard for adjudicating a claim of prosecutorial misconduct in failing to disclose evidence, citing to *Brady*, *Bagley*, and *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995). The court found that the application of this standard did not compel reversal of the trial court, stating that:

> Given the severity of the consequences of a Brady violation, we fail to understand why the prosecutor did not simply err on the side of caution and disclose the videotape to the defense when she obtained it. That said, we have viewed the tape, and conclude it is neither favorable nor material. Although the right side of Sanchez's face is visible, at no time is the camera angle such that the viewer can tell whether there is a visible facial drop. By contrast, Dr. Hysell, the neurosurgeon who testified that such an abnormality was present, was able to view Sanchez head-on so that he could compare the two sides of Sanchez's face. While in the emergency room, Sanchez obeys commands and answers questions. His words are understandable, but his speech is noticeably "thick" and somewhat slurred. He wears an oxygen mask at all times except when he pulls it off to complain that he cannot breathe. He voices this complaint several times and has to be repeatedly told that the mask is helping him breathe. By the time Officer Nelson questions him, the viewer can no longer understand his responses, and they clearly are not coming as rapidly as before. The scene with Sanchez and Nelson is very brief, does not include Sanchez's identification of the perpetrator, and does nothing to counteract Hysell's expert testimony concerning Sanchez's symptoms and mental status, particularly that it was unlikely everything he said would be accurate. If anything, the videotape likely would have had a tendency to impeach Nelson's testimony about the clarity of Sanchez's words and to reinforce Hysell's assessment of confusion, especially in light of the brain matter visibly leaking from Sanchez's ear. In short, the videotape neither hurts the prosecution nor helps the defense, and there is no reasonable probability that, had it

1    been disclosed, the result of appellant's trial would have been different. Accordingly,
     there was no Brady violation and the trial court properly denied the motion for new
2    trial on that ground.

3    (Lod. Doc. 12 at 57-58).  First, the Court notes that the importance of the video is at best tangential

4    as the coverage contained in the video does not include the period of time in which Officer Nelson

5    elicited an identification from the victim.  Thus, the video at most would have spoken to the victim's

6    responsiveness or lack thereof immediately prior to the identification.   Considering Officer Nelson

7    had attested to the victim's responsiveness, namely the lack of slurring in his speech (RT at 1259)

8    and the clarity of the victim's response to the officer's inquiries (RT at 1258),  evidence of the

9    victim's responsiveness as attested to in the video would have been cumulative at best.  As the video

10   tape was cumulative of evidence presented to the jury, the Court does not find it to be so material as

11   to compel the conclusion that its exclusion created a reasonable probability that Petitioner would not

12   have been convicted.  *See* <u>United States v. Sarno</u>, 73 F.3d 1470, 1505 (9th Cir. 1995) (citing *United*

13   *States v. Kennedy*, 890 F.2d 1056, 1061 (9th Cir. 1989) for the proposition that "[c]umulative

14   evidence does not give rise to a *Brady* violation").

15       The Court's review of the video tape leads it to the same conclusions reached by the state

16   appellate court.  It is not clear that the evidence contained in the video would have supported Officer

17   Nelson's testimony about the clarity of the victim's speech as the victim's verbal responses were

18   limited in the video.  (*See* Lod. Doc. 18).  The victim displayed some responsiveness to the doctor's

19   commands to stick out his tongue, shrug his shoulders, and move his feet.  (Id).  However, the video

20   also displayed the victim in a somewhat confused state (he kept trying to take off the oxygen mask)

21   with slurred speech as he responded verbally to the inquiry of what his name was.  Additionally, the

22   coverage of Officer's Nelson inquiry shows the officer repeatedly asking the victim who shot him

23   without a response.  Considering Officer Nelson testified that he was with the victim for

24   approximately thirty to forty-five seconds, the video tape might have lead the jury to question the

25   accuracy of his testimony by providing contradictory evidence of his observations.  (Lod. Doc. 3, RT

26   at 1257).   It is therefore highly unlikely that the evidence would have made Officer Nelson's

27   testimony more reliable, as suggested by Petitioner.  Thus, the Court does not find that the state court

28   unreasonably applied clearly established Federal law in adjudicating Petitioner's *Brady* claim and

1   rejects Petitioner's fourth ground for relief.

2       **C.    Ground Five: *Griffin* Prosecutorial Misconduct**

3       Petitioner claims that the prosecutor committed misconduct in commenting on Petitioner's

4   failure to testify at trial, in violation of his Fifth Amendment privilege against self-incrimination.

5   (Am. Pet. at 27-28).  During closing arguments, the prosecutor stated that, "[n]ow curiously, we have

6   absolutely no knowledge what might have been believed by the shooter."[10]  (RT at 2025).

7       As the California Court of Appeal was the last court to adjudicate the claim on the merits, the

8   California Supreme Court is presumed to have adjudicated the claim for the same reasons as set forth

9   in the Court of Appeal's opinion.  *See* Ylst v. Nunnemaker, 501 U.S. at 803-804.  While the

10  appellate court found that Petitioner had waived this error by failing to object at trial, the court went

11  on to conduct a thorough analysis of why Petitioner could not prevail on this ground.[11]

12      A criminal defendant's rights against self-incrimination, as contained in the Fifth

13  Amendment and applied to the states via the Fourteenth Amendment, forbids "comment by the

14  prosecution on the accused's silence."  Griffin v. California, 380 U.S. 609, 615 (1965).  Thus, the

15  Due Process Clause prohibits a prosecutor from commenting on a defendant's decision not to

16  _____

17      [10]The section of the prosecutor's closing arguments which that statement is derived, states, "Self-defense against
    assault is lawful to defend self from attack if, as a reasonable person, he has grounds for believing and does believe that bodily
18  injury is about to be inflicted.  You see at the bottom it says, person may use all force and means which's reasonably
    necessary. Once again, that word reasonable. Once again, ladies and gentlemen, lawful to defend self from attack if, as a
19  reasonable person, has grounds for believing and does believe. Now curiously, we have absolutely no knowledge what might
    have been believed by the shooter. What we do know is what he said before and what he said after. Other than that, to
20  speculate what else he believed would be just that. Now, you have to look at the evidence and say, okay, what did the
    witnesses say happened. And based on what the witnesses say happened; Mr. Uribi [ sic ], Mr. Flores, briefly Mr. Sanchez,
21  certainly, you can see there was some grounds for something to be believed. But do we have grounds what a reasonable
    person would have believed? No. And again, it has to be bodily injuries about to be inflicted."

22      [11]First, the Court notes that the state appellate court opinion could procedurally bar Petitioner's claim for
    prosecutorial misconduct, especially as Petitioner does not allege here, as he did in state court, that counsel was ineffective
23  for failing to object.  A federal court may address a habeas petition if the last state court to which the petitioner presented his
    federal claims did not clearly and expressly rely on an independent and adequate state ground in denying the petition. *See*
24  Coleman v. Thompson, 501 U.S. 722, 735 (1991).  Respondent argues that the state court did not clearly and expressly rely
    upon California's simultaneous objection rule to deny Petitioner's claim and that the claim may be considered on the merits
25  by this court.  (Answer at 49, n. 17).  The Court deems Respondent to have expressly waived this affirmative defense and
    will not *sua sponte* consider the issue of procedural default.  *See* Trest v. Cain, 522 U.S. 87, 89 (1997) (holding that the court
26  is not required to consider procedural default *sua sponte*); *see also* Vang v. Nevada, 329 F.3d 1069, 1073 (9th Cir. 2003)
    (not erroneous for district court to *sua sponte* consider the issue with notice to the parties); *but cf Boyd v. Thompson,* 147
27  F.3d 1124 (9th Cir. 1998) (distrct court erred in considering issue *sua sponte*); *also* Day v. McDonough, 547 U.S. 198, 207-
    209, 211 n. 11 (2006) (stating that once the State intelligently chooses to waive the affirmative defense of statute of
28  limitations, which is akin to procedural default, the court is not at liberty to consider the issue in disregard of that choice).

testify." <u>Hovey v. Ayers</u>, 458 F.3d 892, 912 (9th Cir. 2006) (citing <u>Griffin</u>, 380 U.S. at 615). "While a direct comment about the defendant's failure to testify always violates *Griffin*, a prosecutor's indirect comment violates Griffin only 'if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.'" <u>Id.</u> (quoting <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809 (9th Cir. 1987)); *see also* <u>Sims v. Brown</u>, 425 F.3d 560, 588-89 (9th Cir. 2005) (finding prosecutor's statements regarding petitioner's lack of remorse during penalty phase did not constitute impermissible comments about petitioner's exercise of his Fifth Amendment right not to testify). A *Griffin* error is harmless, and thus does not require reversal, unless, "'such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal.'" <u>Hovey</u>, 458 F.3d at 912 (quoting <u>Lincoln</u>, 807 F.2d at 809). Thus, "[r]eversal is not required because of a single, isolated prosecutorial comment which may arguably be related to the defendant's failure to testify if the comment does not stress an inference of guilt from silence as a basis for conviction and is followed by a curative instruction." <u>United States v. Chan Yu-Chong</u>, 920 F.2d 594, 598 (9th Cir. 1990) (citing <u>Lincoln</u>, 807 F.2d at 809 (citing <u>United States v. Soulard</u>, 730 F.2d 1292, 1307 (9th Cir. 1984)) and <u>United States v. Kennedy</u>, 714 F.2d 968, 976 (9th Cir. 1983)). Additionally, prosecutorial comments pertaining to the defendant's failure to present exculpatory evidence that do not call attention to the defendant's failure to testify, and comments on the *defense*'s, and not defendant's, failure to counter or explain the testimony presented are permissible. *See* <u>United States v. Mares</u>, 940 F.2d 455, 461 (9th Cir. 1991); <u>Chan Yu-Chong</u>, 920 F.2d at 598-599; *see also* <u>United States v. Patterson</u>, 819 F.2d 1495, 1506 (9th Cir. 1987).

Here, the state court found the prosecutor's statement was unlikely to arouse an impermissible inference by the jury about the defendant's failure to testify considering the context–namely, the issues pertaining to self-defense/heat of passion and the defense's theory that someone else shot the victim. The state court specifically point to:

> Uribe testified that appellant did not want to fight Sanchez. Uribe admitted that he was thinking what appellant may have thought, but he did not know for sure because he was not "in his head." Officer Aranas, who interviewed Flores at the scene, testified to Flores's statement that appellant said, " 'Oh, shit," when the gun went off.

Since Flores did not explain the comment or relate that appellant said anything else, however, Aranas could not say why appellant said what he did.

(Lod. Doc. 12 at 37).

The Court agrees with the state court that the context in which the prosecutor uttered this single comment was highly unlikely to have resulted in the jury drawing an impermissible inference regarding Petitioner's failure to testify. First, it stretches the limits of reasonableness to interpret a reference to the inability to know what was going on in the mind of the shooter at the time of the incident as an indirect reference to Petitioner's failure to testify. This is especially true where the identity of the shooter was is doubt.

Secondly, even if the comment could be interpreted as speaking to Petitioner's failure to testify, the state court's conclusion the single isolated statement indirectly referencing Petitioner's failure to testify was harmless, was not objectively unreasonable in light of Federal law. Impermissible commentary on a defendant's failure to testify requires reversal only where "(1) the commentary is extensive; (2) an inference of guilt from silence is stressed to the jury as a basis for the conviction; and (3) where there is evidence that could have supported acquittal." Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993) (citation omitted), *cert. denied*, 510 U.S. 1191 (1994). In addition to the reasons set forth by the state court, the Court further notes that the trial court's issued curative instructions here, specifically CALJIC No. 2.60, which states "[a] defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference from the fact that a defendant does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way." (CT at 246). The trial court additionally instructed the jury with regards to the prosecutor's burden of proving beyond a reasonable doubt that the defendant is guilty (CALJIC Nos. 2.90, 2.91; CT at 255-256) and that "[n]o lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against him on any essential element." (CT at 247).

Clearly established Federal law dictates that "when the prosecutorial comment is a single, isolated incident, does not stress an inference of guilt from silence as a basis of conviction, and is followed by curative instructions," reversal is not required. Lincoln, 807 F.2d at 809. Here, the prosecutor's comment was a single isolated event which did not stress the impermissible inference of

guilt with the defendant's silence and which was subsequently followed by curative instructions. Consequently, the Court finds Petitioner's claim of prosecutorial misconduct unavailing and Petitioner is not entitled to habeas corpus relief in this ground. Considering the single statement Petitioner complains of was indirect at best, the Court finds the trial court's curative instructions sufficient to foreclose any resulting prejudice.

### D. Ground Six: Prosecutorial Misconduct in Misstating Law

Petitioner alleges that the prosecutor committed misconduct by misstating the law during closing arguments. (Am. Pet. at 29-31). A prosecutor should not misstate the law in closing argument. United States v. Moreland, 509 F.3d 1201, 1216 (9th Cir. 2007) (quoting United States v. Berry, 627 F.2d 193, 200 (9th Cir. 1980); United States v. Artus, 591 F.2d 526, 528 (9th Cir. 1979). "Improper argument does not, per se, violate a defendant's constitutional rights." Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993); *see also* Boyde v. California, 494 U.S. 370, 384-85 (1990) (stating that "prosecutorial misrepresentations ... are not to be judged as having the same force as an instruction from the court").

The appropriate standard for a federal habeas court reviewing claims of prosecutorial misconduct is the narrow standard of whether the conduct violated due process. *See* Darden v. Wainwright, 477 U.S. 168, 181(1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)); Sassounian v. Roe, 230 F.3d 1097, 1106 (9th Cir. 2000); Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996). Prosecutorial misconduct violates due process when it has a "substantial and injurious effect or influence in determining the jury's verdict." Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996) (quoting O'Neal v. McAninch, 513 U.S. 432, 443 (1995)). To succeed on a prosecutorial misconduct claim, the petitioner must initially show that the prosecutor's improper conduct "materially affected the fairness of the trial." United States v. Smith, 893 F.2d 1573, 1583 (9th Cir. 1990) (quoting United States v. Polizzi, 801 F.2d 1543, 1558 (9th Cir. 1986)). If left with "grave doubt" as to whether the error had substantial influence over the verdict, a court must grant collateral relief. Brecht v. Abrahamson, 507 U.S. 619, 631 (1993); Ortiz-Sandoval, 81 F.3d at 899.

In deciding whether the prosecutor's comments rose to the level of a due process violation by rendering the defendant's trial fundamentally unfair, the reviewing court must initially examine the

context in which the remarks were made. *See* <u>Greer v. Miller</u>, 483 U.S. 756, 765-66 (1987) (quoting

<u>Darden</u>, 477 U.S. at 179 and citing <u>Donnelly</u>, 416 U.S. at 639). Attorneys are permitted "reasonably

wide latitude" in presenting their case during closing arguments and "may strike 'hard blows' based

upon the testimony and its inferences, although they may not, of course, employ argument which

could be fairly characterized as foul or unfair." <u>United States v. Birges</u>, 723 F.2d 666, 671-72 (9th

Cir. 1984) (quoting <u>United States v. Gorostiza</u>, 468 F.2d 915, 916 (9th Cir. 1972) (per curiam)).

Here, Petitioner challenges statements made by the prosecutor during rebuttal. The

prosecutor specifically stated that:

> Counsel wants you to believe that because of [the position of Sanchez's hat on
> the ground] that Mr. Sanchez must have moved forward and thus created that sudden
> quarrel to cause you to believe that all of the justifications available under sudden
> quarrel is available to Mr. Solis. It isn't. It isn't because sudden quarrel has
> instructions that you will be reading. And sudden quarrel doesn't discuss the
> instruction as [defense counsel] would like you to believe. But it discusses five
> elements for the provocation. And then the sudden quarrel-or heat of passion
> describes the sudden quarrel position, so it's a very involved instruction. It's not so
> clear and cut as [defense counsel] would like you to believe. It-it's not a four-liner or
> two paragraphs. It's like two or three pages long. You have to read it, reread it, and
> digest it to understand sudden quarrel doesn't apply. And if I had power point up, I
> would have shown you those five elements that are completely unmet.
> First of all, Mr. Solis uses a gun. And it says in the middle of that five points
> no deadly weapon to be used. No dangerous or deadly weapon was used by the person
> who killed during the fight. If the fight started because Mr. Sanchez took a few feet
> forward, fight[']s done. Boom. I shot you, and I killed you. Gee, you know, the fight's
> over pretty quick; isn't it.

(RT at 2056-2057). Petitioner contends that these statements misstate the law regarding heat of

passion or sudden quarrel in mitigation of malice aforethought by referencing the five elements

required for heat of passion or sudden quarrel in excusable homicide. (Am. Pet. at 29-30).

Petitioner contends that the prosecutor in effect argued that Petitioner's use of a firearm prevented

any justification for the homicide, including mitigation of murder to manslaughter. (Id. at 30-31).

The California Court of Appeal was the last court to adjudicate the claim on the merits and

the California Supreme Court is presumed to have adjudicated the claim for the same cited by the

Court of Appeal in their opinion. *See* <u>Ylst v. Nunnemaker</u>, 501 U.S. at 803-804. The state appellate

court rejected Petitioner's claim for several reasons. First, the state court found that Petitioner's

argument was predicated on an incorrect interpretation of the prosecutor's argument. The appellate

court noted that the prosecutor's statements were in rebuttal of the defense's closing, which did not

discuss manslaughter. The Court does not find this interpretation of the prosecutor's rebuttal to be erroneous as there contains no explicit reference to mitigation in the prosecutor's rebuttal. Additionally, considering defense counsel himself later admitted, and Petitioner alleges, that defense counsel did not properly invoke mitigation but rather seemed to have touched on justification in his closing argument, to interpret the prosecutor's *rebuttal* to touch on mitigation is unreasonable.

The court further found that the prosecutor's statements, while lacking in clarity, spoke to "*justification* for homicide, not *mitigation* of murder to manslaughter" and that her statements did not misstate the law of justification for homicide. (Lod. Doc. 12 at 42) (emphasis in original). A federal habeas court is bound by a state court's interpretation of state law, even where the interpretation is announced on direct appeal of the challenged conviction. Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (citing Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) and Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)) (per curiam). Thus, the prosecutor's statements about justification of homicide were not misstatements of the law.

Assuming *arguendo* that the prosecutor misstated the law, the Court does not find that this misstatement so infected Petitioner's trial as to deprive him of a fundamentally fair trial. The appellate court found that prejudice did not result from the prosecutor's statements as the trial court instructed the jury on the law of homicide in general and on heat of passion or sudden quarrel in connection with manslaughter specifically. (Lod. Doc. 12 at 43; RT at 1951-1965). The trial court further instructed the jury that they were to follow and accept the court's instructions on the law, and not counsel's argument. (CT at 213-214; *see also* CALJIC No. 0.50 (stating "[y]ou must accept and follow the law as I state it to you, regardless of whether you agree with it. If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions")). Noting that there exists no Supreme Court precedent mandating that a habeas court grant relief where the trial court has correctly instructed the jury on the applicable law despite the prosecutor's misstatement, the Court finds that the state appellate court did not unreasonably apply clearly established Federal law in holding that no prejudice resulted from alleged misstatements. *See* Donnelly, 416 U.S. at 645 (finding that defendant's right to due process was not violated by prosecutor's ambiguous statements where the

trial court issued curative instructions); *see also* <u>Darden</u>, 477 U.S. at 179-1 (noting that while the prosecutor's comments were undoubtedly improper, the comments did not deprive the defendant of his right to due process considering the trail court's instructions, the weight of the evidence against the defendant, and the prosecutor's statements were responsive to earlier defense arguments).

### E.     <u>Ground Seven: Denial of Motion for Mistrial</u>

Petitioner contends that the trial court's denial of his motion for mistrial resulted in a deprivation of his constitutional right to a fair trial and due process. (Am. Pet. at 32-33). More specifically, Petitioner asserts that a mistrial was warranted by the prosecutorial misconduct (alleged here in Grounds Five and Six), erroneous trial instructions in the form of CALJIC Nos. 5.00 and 5.01 (Ground One), and ineffective assistance of counsel (Ground One). In support of his contention, Petitioner fails to cite to any Supreme Court precedent; rather Petitioner appears to be claiming that the trial court abused its discretion under state law. Habeas relief is not available for errors of state law as it is not the province of a federal habeas court to re-examine state court determinations of state law questions. <u>Estelle</u>, 502 U.S. at 67-68 (citing to *Rose v. Hodges*, 428 U.S. 19, 21 (1975) and 28 U.S.C. § 2241 for the proposition that in conducting habeas review, a federal court is limited to questions of whether the conviction violated the constitution, laws, or treaties of the United States). Thus, to the extent Petitioner argues that the trial court erred in not granting his motion for a mistrial as it constituted an abuse of discretion under state law, Petitioner has failed to establish a cognizable claim for habeas relief before this Court. Respondent notes though that denial of a state created liberty interest may violate a defendant's right to due process, pursuant to *Hick v. Oklahoma*, 447 U.S. 343, 346 (1980). *See also* <u>Ballard v. Estelle</u>, 937 F.2d 453, 456 (9th Cir. 1991) (citing *Board of Pardons v. Allen*, 482 U.S. 369, 381 (1987) for proposition that "[s]tate laws may give rise to liberty interests protected by the Fourteenth Amendment"). In *Hicks*, the Supreme Court found that a criminal defendant was deprived of his right to due process of the law guaranteed by the Fourteenth Amendment when he was impermissibly denied a state created right. "Misapplication of these laws that lead to deprivations of those liberty interests by state institutions may be reviewed in federal habeas corpus proceedings." <u>Ballard</u>, 937 F.2d at 456 (citing *Wasko v. Vasquez*, 820 F.2d 1090, 1091 n. 2 (9th Cir. 1987)).

1    Under California law, trial courts are given wide discretion to decide motions for a mistrial.

2  "A motion for mistrial is directed to the sound discretion of the trial court." <u>People v. Jenkins</u>, 22

3  Cal.4th 900, 985-986 (Cal. 2000).  "A mistrial should be granted if the court is apprised of prejudice

4  that it judges incurable by admonition or instruction." <u>People v. Haskett</u>, 30 Cal.3d 841, 854 (Cal.

5  1982) (citing <u>People v. Woodberry</u>. 10 Cal.App.3d 695, 708 (Cal. Ct. App. 1970) (stating that, "[a]

6  motion for a mistrial, on the other hand, serves a different purpose. Such motion, when made under

7  the circumstances here present, presupposes the effect of the evidence is so prejudicial as to be

8  incurable by striking it and admonishing the jury to disregard it").  Furthermore, "[w]hether a

9  particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is

10 vested with considerable discretion in ruling on mistrial motions." <u>Haskett</u>, 30 Cal.3d at 854 (citing

11 <u>Illinois v. Somerville</u>, 410 U.s. 458, 461-462 (1973)).

12    The California Court of Appeal, the last state court to decide Petitioner's claims on the

13 merits, found that the trial court had not abused its discretion in denying the motion.  The appellate

14 court's conclusion rested on its prior findings that no prosecutorial misconduct, instructional error, or

15 ineffective assistance of counsel had occurred; thus no prejudice had resulted.  The trial court's

16 denial of Petitioner's motion for mistrial, and the appellate court's subsequently affirmation of this

17 ruling, was not contrary to clearly established Federal law as the errors Petitioner complains of did

18 not "so infuse[] the trial with unfairness as to deny due process of law." <u>Estelle</u>, 502 U.S. at 75

19 (citing <u>Lisenba v. California</u>, 314 U.S. 219, 228 (1941)).  The Court also notes that in addressing

20 each of these alleged errors in their respective claims, discussed *ante*, the appellate court had found

21 that no prejudice resulted even if the conduct complained of was erroneous.  The Court thus does not

22 find the appellate court's conclusion was objectively unreasonable as Petitioner has failed to

23 establish that he was deprived of a state created liberty interest.

24    **F.    Ground Eight: Trial Court's Failure to Assist Jury**

25    Petitioner alleges that the trial court's response to the jury's inquiries were inadequate and as

26 a result, denied him a fair trial.  (Am. Pet. at 34-36).

27    The jury asked two questions: (1) "Clarification on the difference between Murder I & II.  If

28 someone has a gun, is it automatically murder one;" (CT at 201) (2) "Does 8.10–i.e. Death resulting

from the commission of a felony ("assault using a firearm") stand alone?  In other words, using

instruction 8.10,[12] do we need 'premeditation'?"  (CT at 203).  The trial court responded by

suggesting that the jury reread certain instructions; that the jury review other instructions as

necessary; and that the jury remember that they must consider instructions altogether.  (CT at 204;

RT at 2085-2086).  The instructions the trial court singled out for review to the jury were CALJIC

Nos. 8.10 (defining murder), 8.11 (defining malice aforethought), 8.20 (regarding deliberate and

premeditated murder), 8.30 (regarding unpremeditated murder of the second degree), 8.31 (regarding

second degree murder in a killing resulting from an unlawful act dangerous to life, and 8.37 (defining

manslaughter).

　　　　In support of his contention, Petitioner cites to *Hick v. Oklahoma*, 447 U.S. at 346, for the

proposition that a court's failure to properly discharge the obligation of assisting the jury violates the

defendant's Sixth Amendment right to a fair trial and unanimous jury verdict.  As noted previously,

the Supreme Court in *Hicks* found that a criminal defendant's right to due process of the law is

implicated when the defendant is denied a state created right.  In *Hicks*, the state created right was

the right to have a jury determine his sentence; here, Petitioner claims he was deprived of the state

created right to have the judge assist the jury during deliberations.

　　　　While the California Court of Appeal did not directly address whether Petitioner's due

process rights were implicated by the trial court's response to the jury's inquiry, the appellate court's

decision and the record provide ample basis for finding that Petitioner's due process rights had not

been violated by the trial court's response.  Where a state court provides no rationale for its decision,

a federal habeas court determines whether the state court's decision was "objectively unreasonable"

based on its independent reading of the record.  <u>Brazzel</u>, 491 F.3d at 981; <u>Himes</u>, 336 F.3d at 853.

---

[12]CALJIC No. 8.10 states: The defendant is accused in Count One of having committed the crime of murder, a violation Penal Code Section 187.

　　　　Every person who unlawfully kills a human being with malice aforethought or during the commission or attempted commission of assault with a firearm a felony inherently dangerous to human life is guilty of the crime of murder in violation of section 187 of the Penal Code.

　　　　A killing is unlawful, if it was neither justifiable nor excusable.  In order to prove this crime, each of the following elements must be proved:

　　　　A human being was killed;

　　　　The killing was unlawful; and

　　　　The killing was done with malice aforethought or occurred during the commission or attempted commission of an inherently dangerous felon to human life felony, namely assault with a firearm here.  (RT at 1952-1953).

Here, the appellate court did not address whether Petitioner's constitutional rights were violated as the court had already concluded that the trial court's response was adequate in aiding the jury–thus negating a finding that the Petitioner was deprived of a state created liberty interest in having the judge aid the jury during deliberations. As the Court does not find the state court's conclusion to be erroneous, the Court necessarily finds that Petitioner was not deprived of this state created interest.

California Penal Code section 1138 provides that after the jury has commenced deliberations, "if they desire to be informed on any point of law arising in the case...the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." The present case is consequently distinct from the cases upon which Petitioner relies, such as *People v. Gonzales*, 88 Cal.Rptr.2d 111, 117 (Cal. Ct. App. 1999), where the trial court's response did not offer any assistance and overlooked an instruction on the pertinent defense theory, or *People v. Beardslee*, 53 Cal.3d 68, 96-97 (Cal. 1991), where the trial court refused to aid the jury by telling the jury that no further instructions were to be had despite the jury 's explicit request for clarification on certain instructions. In citing to *Gonzales*, the California Supreme Court noted that section 1138 "does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." This is not a case where the trial court "figuratively throw[s] up its hands and tell[s] the jury it cannot help." Beardslee, 53 Cal.3d at 97. Rather, the trial court in Petitioner's case directed the jury to consider those instructions which it considered most helpful in answering the questions posed by the jury. Thus, the trial court adequately addressed the jury's inquiries with regard to the applicable rules of law while being mindful of not intruding upon the jury's fact finding role. *See* Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003) (emphasizing that the trial court must respond to jury questions concerning important legal issues, but, despite its wide discretion in the matter of charging the jury, it must also be careful not to invade the jury's province as fact finder). More importantly, the state court's finding that such actions satisfied the state created right of having the judge aid the jury in their deliberations is entitled to deference as it is an interpretation of state law.

Petitioner's contends that "the jury questions suggested the panel erroneously believed use of the weapon made it necessary to find the killing was willful, deliberate, and premeditated before returning a first degree murder conviction." (Am. Pet. at 35). Petitioner argues that the trial court's response should have corrected this "skewed understanding of the importance of a firearm in a homicide case." (Id). This contention is without merit as the question reveals the opposite. Had the jury believed that the use of the gun necessitated a finding that the killing was wilful, deliberate, and premeditated, the jury would not have questioned whether possession of a gun automatically meant conviction on murder–one considering the intent for murder one is that the killing was wilful, deliberate, and premeditated. Rather, the first question reveals that the jury was uncertain as to whether possession of the firearm equated such a finding.

Thus, the Court does not find that Petitioner was deprived of a state created liberty interest such that his rights under the federal constitution would be implicated and that Petitioner is not entitled to habeas corpus relief on this ground.

### G.      Ground Nine: Jury Misconduct in Considering Defendant's Failure to Testify

Petitioner contends that the jury's consideration of his failure to testify during deliberations violated his Fifth Amendment privilege against self-incrimination and his right to a fair trial.[13] Petitioner bases his argument on a declaration by trial counsel's assistant that a juror had discussed, after the verdict, the jury's deliberation with counsel and had in the course of this conversation informed counsel that the jury had held Petitioner's failure to testify against him. (Pet. Ex. D). Trial counsel motioned for a new trial. The trial court, after reviewing the juror's statements, found that no misconduct had occurred. (RT at 2131-2132).

The California Court of Appeal failed to address Petitioner's claim that his constitutional rights were violated by jury misconduct though the appellate court affirmed the trial court's ruling against Petitioner's motion for a new trial. (Lod. Doc. 12 at 55-56). As the state court did not

---

[13]In support of his contention that the jury's misconduct violated his right against self-incrimination, Petitioner cites to *Griffin* and *Williams v. Lane*, 826 F.2d 654, 664 (7th Cir. 1987) in support of his claims. (Am. Pet. at 38). Petitioner's reliance on these cases is misguided as neither supports the proposition that a criminal defendant's right against self-incrimination is violated by jury misconduct. Rather, both *Griffin* and *Williams* pertain to prosecutorial misconduct in commenting on a defendant's failure to testify. Williams, 826 F.2d at 664-667; Griffin, 380 U.S. at 612-614. Petitioner has thus failed to provide any legal authority upon which the alleged jury misconduct violated his right against self-incrimination.

provide a rationale for its decision, a federal habeas court determines whether the state court's decision was "objectively unreasonable" based on its independent reading of the record. Brazzel, 491 F.3d at 981; *see also* Himes, 336 F.3d at 853.

The Court initially notes that the trial court's determination, that the jury did not make Petitioner's failure to testify part of their deliberations, is a factual finding. As such, this finding must be an "unreasonable determination of the facts in light of the evidence presented" to warrant habeas relief. 28 U.S.C. § 2254(d)(2). After considering the record, the Court cannot say that the trial court's conclusion was unreasonable as the declarations submitted by the jurors to the state courts, under penalty of perjury, deny any discussion of Petitioner's failure to testify. (*See* Pet. Exs. F. and G at 3; RT at 2131-32).[14]

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public, by an impartial jury..." U.S. Const., Amends. 6 and 14; *see* Duncan v. Louisiana, 391 U.S. 145, 153 (1968). In reviewing a claim of juror misconduct, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974). Thus, allegations of juror misconduct are cognizable federal habeas claims to the extent a petitioner is arguing that he was denied a fair trial. *See* Jeffries v. Blodgett, 5 F.3d 1180, 1189 (9th Cir. 1993) (finding that question on habeas review is whether juror misconduct deprived defendant of his or her right to fair trial). "To obtain relief, petitioners must now show that the alleged error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 1190 (quoting Brecht, 507 U.S. at 637-639 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)); *see also* Sassounian v. Roe, 230 F.3d 1097, 1108.

As noted by Respondent, the Sixth Amendment guarantee of a fair trial requires that the verdict be based upon evidence introduced at trial. Hollbrook v. Flynn, 475 U.S. 560, 567 (1986)

---

[14]The Court also notes that under the Federal Rules of Evidence, this Court's ability to consider a juror's statement is limited to the exceptions contained in Rule 606(b) which permits juror testimony as to "extraneous prejudicial information...improperly brought to the jury's attention" or "outside influence...improperly brought to bear upon any juror." This limitation applies to petitions for habeas corpus submitted by state court prisoners. *See* Fed.R.Evid. 1101(e); *see also* Capps v. Sullivan, 921 F.2d 260, 262 (10th Cir. 1990) (finding Rule 606(b) applied to federal habeas proceedings). Testimony regarding the jury's consideration of a defendant's failure to testify does not qualify under either of those exceptions. United States v. Rutherford, 371 F.3d 634, 639-640 (9th Cir. 2004). Thus, post-verdict affidavits by the jury cannot be considered as evidence by a federal habeas court.

(stating "[c]entral to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial'") (quoting Taylor v. Kentucky, 436 U.S. 478, 485 (1978)); Turner v. Louisiana, 379 U.S. 466, 472-473 (1965). Petitioner's failure to testify in his own defense is not extrinsic evidence. Raley v. Ylst, 470 F.3d 792, 803 (9th Cir. 2006) (citing United States v. Rodriguez, 116 F.3d 1225, 1226-1227 (8th Cir. 1997). In *Raley*, the Ninth Circuit found that the jury's discussion of forbidden topics, including a defendant's failure to testify, did not amount to a due process violation as it was not extrinsic evidence. Similarly, even assuming that the jury discussed Petitioner's failure to testify, such actions by the jury would not constitute a violation of Petitioner's right to a fair trial. Thus, the Court must reject Petitioner's request for relief on this ground.

## **H.     Ground Ten: Cumulative Error**

While no single alleged error may warrant habeas corpus relief, the cumulative effect of errors may deprive a petitioner of the right to a fair trial. Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Donnelly*, 416 U.S. at 643 (1974) and *Chambers v. Mississippi*, 410 U.S. 284, 290 (1973) in concluding that habeas corpus relief is available under clearly established Supreme Court precedent where the combination of multiple trial errors gives rise to a due process violation by rendering the trial fundamentally unfair, even where each individual error would not by itself require reversal); Karis v. Calderon, 283 F.3 1117, 1132 (9th Cir. 2002); *see also* Ceja v. Stewart, 97 F.3d 1246, 1254 (9th Cir. 1996).

The California Court of Appeal rejected Petitioner's claim of cumulative error, find that Petitioner had not been "deprived of due process and a fair trial by the combination of ineffective assistance of counsel, prosecutorial misconduct, and trial court error." (Lod. Doc. 12 at 58). The state court identified the correct standard, noting that, " even where errors are not in themselves prejudicial, their cumulative effect may be cause for reversal...Accordingly, we review each allegation and assess the cumulative effect of any errors to see if it is reasonably probably the jury would have reached a result more favorable to defendant in their absence." (Id.) (citations omitted).

The appellate court concluded that, "[u]tilizing the foregoing standard, we find no cause for reversal. To the extent the record establishes errors in the proceeding, it also establishes they were harmless or subject to our correction without the need for a complete reversal of the entire case. The record simply does not support a finding of cumulative error." (Id).

The Court does not find the appellate court's application of clearly established Federal law unreasonable. Petitioner's claim of cumulative error must be rejected because, as discussed *ante*, any constitutional errors did not result in prejudice to Petitioner. As Petitioner did not suffer prejudice as a result of any of the alleged errors, Petitioner cannot establish cumulative prejudice by combining his claims into a group.

## I. Ground Eleven: Denial of Motion for New Trial

Petitioner amended his original petition to include this additional ground for relief. Petitioner contends that the trial court abused its discretion in denying his motion for a new trial. Petitioner argues that as certain errors had rendered the trial unfair and denied him his right to due process of the law, the trial court's failure to grant his motion was "an abuse of discretion meriting reversal of the judgment." (Am. Pet. at 44). Petitioner based his motion for a new trial on (1) counsel's ineffective assistance in failing to object to CALJIC No. 5.01 (Ground One of this petition); (2) prosecutorial misconduct in misstating the law (Ground Six); (3) prosecutorial misconduct in arguing evidence outside the trial record[15]; (4) *Brady* error (Ground Four); (5) trial court's abuse of discretion in not permitting testimony by alleged alibi witness; (6) trial court's failure to assist jury (Ground Eight); (7) jury misconduct (Ground Nine). (Am. Pet. at 42). The California Court of Appeal found that the trial court did not abuse its discretion in denying Petitioner's motion for a new trial.

The Court has found, *ante*, that the errors Petitioner alleges in his motion were either not erroneous or were not prejudicial such that they violated Petitioner's constitutional rights. "A federal

---

[15]Petitioner argues in the brief submitted to the trial court that the prosecutor made assertions that the gun had been aimed and that the victim had stopped moving toward the Petitioner once the gun had been brandished. These contentions were not presented to this Court in the petition for writ of federal habeas corpus. The California Court of Appeal found that the trial court did not abuse its discretion in permitting the prosecutor "wide latitude allowed prosecutors with respect to discussing and drawing inferences from the evidence at trial." (Lod. Doc. 12 at ). Petitioner's challenge to this particular claim rests on an alleged error of state law and it is not the province of this court to review such an error. Estelle v. McGuire, 502 U.S. at 68 (stating "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States").

court may not issue the writ on the basis of a perceived error of state law." Pulley v. Harris, 465 U.S. 37, 41 (1984); *see also* Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (stating that "federal habeas corpus relief does not lie for errors of state law"). As the Court has found no violation of Petitioner's constitutional rights stemming from these alleged errors, Ground Eleven is solely a claim that the trial court abused its discretion by denying Petitioner's motion for a new trial. Thus, Petitioner has failed to present a cognizable claim for habeas corpus relief. *See* Washington v. Horel, 2008 WL 4427221 *4 (C,D, Cal. 2008) (stating "federal courts generally are bound by a state court's construction of state laws, including the denial of a motion for new trial under state law, unless the petitioner can show an independent violation of his federal constitutional rights"); *see also* Acosta v. Evans, 2008 WL 789744 *37 (C.D.Cal. 2008); Coleman v. Newland, 2001 WL 725388 *7 (N.D.Cal. 2001).

To the extent that Petitioner is attempting to characterize this claim as a federal due process violation, the law is clear that a habeas petitioner cannot "transform a state-law issue into a federal one merely by asserting a violation of due process." Langford v. Day, 110 F.3d 1386, 1388-89 (9th Cir. 1996); *see also* Hiivala v. Wood, 195 F.3d 1098, 1106 (9th Cir. 1999) (citing Gray v. Netherland, 518 U.S. 152, 162-63 (1996) (stating "general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion)).

Assuming *arguendo* that Petitioner's claim is cognizable, Petitioner has not demonstrated any prejudice stemming from the trial court's denial of his motion. As discussed *ante*, the court has found no violations of the federal constitutional on any of the grounds Petitioner based his motion for a new trial. *See* Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (stating "[b]ecause there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation"). Consequently, the Court finds that the state court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law; thus Petitioner is not entitled to relief on this ground. *See* 28 U.S.C. § 2254(d)(1).

## IV.    Certificate of Appealability

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-

El v. Cockrell, 123 S.Ct. 1029, 1039 (2003).  The controlling statute in determining whether to issue

a certificate of appealability is 28 U.S.C. § 2253, which provides that a circuit judge or judge may

issue a certificate of appealability where "the applicant has made a substantial showing of the denial

of a constitutional right."  Where the court denies a habeas petition, the court may only issue a

certificate of appealability "if jurists of reason could disagree with the district court's resolution of

his constitutional claims or that jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further."  Miller-El, 123 S.Ct. at 1034; Slack v. McDaniel, 529 U.S. 473,

484 (2000).  While the petitioner is not required to prove the merits of his case, he must demonstrate

"something more than the absence of frivolity or the existence of mere good faith on his . . . part."

Miller-El, 123 S.Ct. at 1040.

In the present case, the Court finds that reasonable jurists would not find the Court's

determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or

deserving of encouragement to proceed further.  Petitioner has not made the required substantial

showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a

certificate of appealability.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. The Petition for Writ of Habeas Corpus is DENIED with prejudice;

2. The Clerk of Court is DIRECTED to enter judgment; and

3. The Court DECLINES to issue a certificate of appealability.

**IT IS SO ORDERED.**

**Dated:    March 23, 2009**                                          **/s/ John M. Dixon**
                                                               **UNITED STATES MAGISTRATE JUDGE**